[No. 31487-4-I. Division One. January 18, 1994.]

KATHARINE SEDWICK, *Respondent*, v. STEPHEN M. GWINN, ET AL, *Appellants*.

880

*Kenneth B. Kaplan, Michael B. King,* and *Lane Powell Spears Lubersky,* for appellants.

*C. Nelson Berry* and *Cynthia Whitaker,* for respondent.

PEKELIS, A.C.J. — Stephen, Stanley, and Ruth Gwinn (the Gwinns) appeal the trial court's order granting Katharine Sedwick's (Sedwick) motion for partial summary judgment. The Gwinns contend that genuine issues of material fact exist as to whether the challenged loan transactions involved either the actual intent to defraud or constructive fraud under the Uniform Fraudulent Transfer Act. We agree and reverse.

## I

In September 1991, trial commenced between Katharine Sedwick and Stephen Gwinn on Sedwick's petition for a postdissolution modification to their parenting plan. At this time, Stephen experienced a cash flow shortage caused, in part, by litigation expenses, living expenses, unemployment due to psychiatric disability, and insufficient income from his property holdings. As a result, Stephen sought and obtained a loan from his parents, Stanley and Ruth Gwinn, in November 1991. In their affidavits, Stephen and Stanley Gwinn and James Abbott, counsel for a construction company owned by Stephen, each averred that Stephen sought the loan from his parents for litigation and living expenses.[1]

In a deposition taken prior to the submission of his affidavit, Stanley stated that he and Ruth had considered the loan amount "open-ended", that they had no particular limit in mind, and that he did not plan to demand repayment from Stephen.

Stanley and Ruth required Stephen to provide security for the loan. On November 5, 1991, Stephen executed two promissory notes in the amounts of $13,000 and $82,800 in exchange for two checks in those amounts. Both notes and "any renewals, modifications or extensions thereof and all such further sums as may be advanced or loaned" were secured as follows:

> by an Assignment of Partnership Interest in S & M Partnership and an Assignment of Real Estate Contract between Borrower (as Seller) and John A. and Joan Carter (as Buyer), both Assignments of even date with this Note.

On November 5, 1991, Stephen executed an "Assignment of Real Estate Contract" of the Carter real estate contract as security for the promissory notes. Under that real estate contract, Stephen was to receive $75,000 from the Carters, in the form of a $15,000 down payment and $600 monthly interest payments until the $60,000 balance became due on April 1, 1992. In February 1992, the Carters made one

---

[1] By affidavit, Ruth adopted Stanley's statements in toto.

monthly interest payment to Ruth and Stanley.[2] On April 7, 1992, the Carters admitted that $57,592.05 was the balance due on the contract.

On November 5, 1991, Stephen also executed an "Assignment of Partnership Interest" of the S&M Partnership as security for the promissory notes. Stephen owned a 50 percent interest in the S&M Partnership. At the time of the assignment, the S&M Partnership's sole asset was a $152,000 promissory note, secured by a second deed of trust, upon which monthly $1,294 interest payments were due until the entire balance became due on April 1, 1992.[3]

On or about November 6, 1991, Stephen delivered copies of these assignments to his attorneys for immediate recording. However, due to a delay in delivering the original documents, they were not recorded until December 6, 1991.

In mid-November 1991, Stephen learned that Warren & Lewis had defaulted on the deed of trust securing the promissory note owned by the S&M Partnership, which in turn, caused Stephen to be in default to his parents pursuant to the following provision contained in both promissory notes:

> Borrower agrees to protect and defend the Collateral from and against any impairment of its value. Failure to so protect the Collateral shall constitute a default hereunder.

To avoid default, Stephen and his parents agreed that he would provide additional security for the loans. On December 5, 1991, Stephen executed an amendment to each promissory note in which he acknowledged the default and resecured the notes as follows:

> In consideration of Lender's forbearance from accelerating the Note, Borrower hereby modifies the Note to provide that the Note will be further secured by an Assignment of Partnership Interest in the GLG Partnership. . . .

---

[2] Sedwick claims that all other interest payments were made to Stephen, but the only evidence in the record is a list of Stephen's assets from a pretrial affidavit filed in a later proceeding.

[3] In 1988, the S&M Partnership sold a commercial office building to Warren & Lewis Properties, Inc., in exchange for a down payment, the assumption of a $1,400,000 mortgage, and a $152,000 promissory note.

Stephen then executed an "Assignment of Partnership Interest" for the GLG Partnership in which he, Stanley, and Ruth each owned a 33$^1$/$_2$ percent interest. The GLG Partnership's sole asset was 9 acres of undeveloped and unappraised property. At the time of the assignment, the property's value was unascertained due to a partial wetlands classification in 1989.[4]

On November 12, 1991, the trial court rendered its oral ruling in Sedwick's favor on her petition to modify the parenting plan. The trial court also scheduled a hearing for December 20, 1991, to determine whether Sedwick should be awarded her attorney's fees. In his declaration, Steven J. Fields, Stephen's domestic relations attorney, stated that the purpose of the attorney's fees hearing was to determine whether Sedwick should be granted her attorney's fees based on her financial circumstances. In Fields' opinion, it was "extremely unlikely" that Sedwick would be granted attorney's fees because her net worth was approximately $1 million and her cash flow had been approximately $221,000 the previous year. In his affidavit, Stephen also averred that, at the time of trial, he "was not at all concerned about an award of attorneys' fees" because Sedwick had substantial assets. On December 20, 1991, the court awarded Sedwick $142,181 in attorney's fees.

In February 1992, Warren & Lewis paid off the promissory note owned by S&M Partnership. Stanley and Ruth then received $79,133.56, which represented Stephen's interest in the S&M Partnership and several months of delinquent interest payments.

In February and March 1992, Stanley and Ruth made additional advances to Stephen totaling $60,152.77.[5] On

---

[4]Stanley estimated the value before the wetlands designation as approximately $500,000 and after the wetlands designation as $144,000. Stanley also stated that, because of the wetlands designation, he did not believe that the property would be sold or developed.

Stephen had estimated his interest to be worth $48,000, but, later in his affidavit, stated that it was worth less than that amount.

[5]Of this amount, $54,474.55 paid Stephen's attorney's fees and $5,678.22 paid Stephen's GLG Partnership expenses.

March 25, 1992, Stephen executed a third promissory note to them for $13,101.66. To secure the note, Stephen again assigned his interest in the GLG Partnership. By the end of March 1992, Stanley and Ruth's loans to Stephen totaled $155,952.77.

In April 1992, Sedwick instituted this action in an attempt to collect her attorney's fees award, alleging, in part, that Stephen's assignments of interest in the S&M Partnership, the Carter real estate contract, and the GLG Partnership constituted fraudulent transfers under the Uniform Fraudulent Transfer Act (UFTA). On July 2, 1992, Sedwick moved for partial summary judgment to avoid the transfers to Ruth and Stanley.[6] The trial court denied the motion. Sedwick moved for reconsideration. On August 14, 1992, the trial court reversed its previous ruling and granted Sedwick's partial summary judgment motion.

## II

The Gwinns assign error to the trial court's ruling that there was no genuine issue of material fact as to whether Stephen's assignments: (1) were made with the *actual intent* to defraud Sedwick or (2) constituted *constructive* fraud under the UFTA.

An appellate court reviewing a summary judgment order must engage in the same inquiry as the trial court. *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990). Summary judgment is appropriate "only when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." *Marincovich*, at 274; CR 56(c). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton Condominium Apartment-Owners Ass'n v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990). On review,

[t]he court must consider the facts in the light most favorable to the nonmoving party, and the motion should be granted

---

[6]Sedwick also challenged Stephen's loan transactions involving his sister, Sandra Gwinn. However, Sedwick did not move for summary judgment on these transactions.

only if, from all of the evidence, reasonable persons could reach but one conclusion.

*Marincovich*, at 274; CR 56(c).

In addition, we "must view the evidence presented through the prism of the substantive evidentiary burden." *Adams v. Allen*, 56 Wn. App. 383, 393, 783 P.2d 635 (1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 91 L. Ed. 2d 202, 106 S. Ct. 2505, 2513 (1986)). Under Washington's UFTA, the actual intent to defraud must be demonstrated by "clear and satisfactory proof". *Clearwater v. Skyline Constr. Co.*, 67 Wn. App. 305, 321, 835 P.2d 257 (1992), *review denied*, 121 Wn.2d 1005 (1993). In contrast, constructive fraud must be shown by "substantial evidence". *Clearwater*, at 321.

Under the former Uniform Fraudulent Conveyance Act (UFCA), the burden of proof rested upon the party alleging the fraudulent conveyance. *See Columbia Intern. Corp. v. Perry*, 54 Wn.2d 876, 880, 344 P.2d 509 (1959). Cases decided under the UFCA are relevant when interpreting the UFTA because the acts' provisions are essentially the same. *See Clearwater*, 67 Wn. App. at 321. Because no reason exists to alter the burden of proof under the UFTA, we hold that the burden of proof rests on the party alleging the fraudulent transfer.

### ACTUAL INTENT TO DEFRAUD

The Gwinns contend that Sedwick failed to prove an actual intent to defraud under RCW 19.40.041(a)(1). Under that section, a transfer is fraudulent if it is made by a debtor with the actual intent to hinder, delay, or defraud any creditor. In determining whether actual intent was present, consideration may be given to the 11 factors or "badges of fraud" listed in RCW 19.40.041(b).[7]

The Gwinns contend that summary judgment is inappropriate for resolving whether a debtor made a transfer with the actual intent to defraud, at least where the debtor

---

[7]These enumerated factors are modeled on the UFCA, which essentially codified the common law. *See Rainier Nat'l Bank v. McCracken*, 26 Wn. App. 498, 506, 615 P.2d 469 (1980), *review denied*, 95 Wn.2d 1005 (1981).

denies such intent. They argue that intent is a question of fact best determined by a trier of fact after hearing the testimony and assessing the witnesses' credibility. As support for this proposition, the Gwinns cite the following language from an out-of-state decision:

> [t]he determination of the question of fraudulent intent is clearly an issue of fact which must often be inferred from surrounding circumstances. *Knower* v. *Cadden Clothing Co.*, 57 Conn. 202, 221-22, 17 A. 580 [(1889)]. Where, however, the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings, summary judgment procedure is particularly inappropriate. *White Motor Co.* v. *United States*, 372 U.S. 253, 259, 83 S. Ct. 696, 9 L. Ed. 2d. 738 [(1963)] . . . "'It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given to their testimony can be appraised.' *Poller* v. *Columbia Broadcasting System, Inc.*, [368 U.S. 464, 473, 82 S. Ct. 468, 7 L. Ed. 2d 458] [(1962)]; *Fortner Enterprises, Inc.* v. *United States Steel Corporation*, 394 U. S. 495, 500, 89 S. Ct. 1252, 22 L. Ed. 2d 495 [(1969)]." . . .

*Town Bank & Trust Co. v. Benson*, 176 Conn. 304, 308-09, 407 A.2d 971, 974 (1978).

Thus, the Gwinns argue that the presence of some, or even all, of the statutory factors listed in RCW 19.40.041(b) do not amount to an exclusive "objective" test for determining whether there is an actual intent to defraud. It is their position that even if all of the statutory factors are established as a matter of law, summary judgment cannot be granted in favor of a creditor because these factors are merely circumstantial evidence of the actual intent to defraud. Therefore, the testimony of those knowledgeable about the transfers should be permitted to rebut the circumstantial evidence of intent.

The Gwinns' contention is supported by the express terms of RCW 19.40.041(b) which provides:

> In determining actual intent . . ., consideration *may* be given, *among other factors*, to whether . . . [the 11 enumerated factors are present].

(Italics ours.) The statute, thus, provides that the enumerated factors are nonexclusive and precatory, indicating that

other evidence impacting on intent should also be considered. *See also Clearwater*, 67 Wn. App. at 320 (stating the trial court *may* consider the 11 factors to determine intent).

The Gwinns' contention is also consistent with case law from other jurisdictions.[8] In *Estate of Lane v. Lane*, 631 P.2d 103, 106 (Alaska 1981), cited by the Gwinns, the court stated:

> the mere presence of these indicia of fraud is in itself insufficient to warrant summary judgment, since the badges are merely evidentiary: they are circumstantial evidence of intent, no more.[9]

*See also Lindholm v. Holtz*, 221 Ill. App. 3d 330, 581 N.E.2d 860, 864 (1991) (holding, under the Illinois UFTA, that proof of some, or even all, of the statutory factors does not create a presumption of actual intent to defraud as the factors are indicators of actual intent which the trial court may rely on to make findings based on the evidence presented by the parties).

Thus, we conclude that the statutory factors are only circumstantial evidence of intent, and in cases where the debtor denies that his or her intent was to defraud, the issue cannot be conclusively determined by the trier of fact until it has heard the testimony and assessed the witnesses' credibility.[10]

---

[8]Because RCW 19.40.903 provides that the UFTA should be construed in a uniform manner throughout the states, case law from other jurisdictions can provide guidance in interpreting the UFTA.

[9]In *Lane*, a common law fraudulent conveyance case, the Alaska Supreme Court reversed an order of summary judgment in favor of a creditor even though a number of the recognized "badges of fraud" were present. *Lane*, at 106.

[10]We reject Sedwick's contention that the Gwinns are attempting to create a genuine issue of material fact by submitting "self-serving" affidavits to conflict with Stanley's earlier deposition testimony in which he stated that he had no plans to demand repayment of Stephen. As support, Sedwick relies on *Marshall v. AC&S, Inc.*, 56 Wn. App. 181, 185, 782 P.2d 1107 (1989) (holding that a "self-serving" affidavit, submitted as the only contradictory evidence about the disputed issue, cannot raise a genuine issue of material fact). However, *Marshall* is inapplicable because there the only contradictory evidence was the nonmoving party's affidavit, while here the affidavit testimony of other witnesses is consistent with Stanley's affidavit.

Here, Stephen, Stanley, Ruth, and Abbott each stated that the loans were made to aid Stephen in paying his legal and living expenses and, in so doing, there was no intent to defraud Sedwick. Second, Stephen, Fields, and Abbott each stated that, at the time of the loan transactions, there was no expectation that Sedwick would be awarded attorney's fees in the modification proceeding because of her adequate financial situation. Third, the Gwinns testified, and the documentary evidence confirms, that the loan documents were executed and recorded before the trial court awarded Sedwick attorney's fees on December 20, 1992.

Viewing the evidence in the light most favorable to the Gwinns, we find that Sedwick has failed to demonstrate by "clear and satisfactory proof" that no genuine issue of material fact existed on the issue of the actual intent to defraud, and thus summary judgment was inappropriately granted on this basis.

## CONSTRUCTIVE FRAUD

We next address the Gwinns' contention that Sedwick failed to prove constructive fraud under RCW 19.40.041(a)(2)(i). Under that section, a transfer is constructively fraudulent if it is made by a debtor without receiving reasonably equivalent value in exchange for the transfer *and* (1) the debtor was left by the transfer or obligation with unreasonably small assets for a transaction or the business in which the debtor was engaged *or* (2) the debtor intended to incur, believed, or reasonably should have believed that he or she would incur, more debts than the debtor would be able to pay.[11] RCW 19.40.041(a)(2)(i)-(ii); *see also Clearwater*, 67 Wn. App. at 320-21.

At issue here is whether Stephen made the assignments without receiving reasonably equivalent value in exchange for them and whether he intended to incur, believed, or reason-

---

[11]RCW 19.40.051(a) provides a third basis for establishing constructive fraud as to a creditor whose claim arose before the transfer. Although Sedwick argues that the conveyances were fraudulent under RCW 19.40.051, she did not raise this issue below and thus, she cannot raise it for the first time on appeal. *Woodcreek Land Ltd. Partnerships v. Puyallup*, 69 Wn. App. 1, 11, 847 P.2d 501 (1993).

ably should have believed that he would incur, more debts than he would be able to pay. RCW 19.40.041(a)(2)(i)-(ii).

The Gwinns first argue that a genuine issue of material fact exists as to whether Stephen received reasonably equivalent value in exchange for the assignments.[12]

 A comment to the UFTA explains how the element of "reasonably equivalent value" should be applied in cases, such as this, where property is transferred *as security* for a debt:

> Under this Act, . . . a transfer for security is ordinarily for a reasonably equivalent value not withstanding a discrepancy between the value of the asset transferred and the debt secured, since the amount of the debt is the measure of the value of the interest in the asset that is transferred.

Uniform Fraudulent Transfer Act § 3 comment, 7A U.L.A. 651 (1985).

The comment further states:

> The premise of this Act is that when a transfer is for security only, the equity or value of the asset that exceeds the amount of the debt secured remains available to unsecured creditors and thus cannot be regarded as the subject of a fraudulent transfer merely because of the encumbrance resulting from an otherwise valid security transfer. Disproportion between the value of the asset securing the debt and the size of the debt secured does not, in the absence of circumstances indicating a purpose to hinder, delay, or defraud creditors, constitute an impermissible hindrance to the enforcement of other creditors' rights against the debtor-transferor.

Uniform Fraudulent Transfer Act § 4 comment, 7A U.L.A. at 654.

In disputing whether the value of the assignments given as security was reasonably equivalent to the loaned amounts, Sedwick ignores the premise underlying the UFTA, *i.e.*, that where the transfer is given *as security*, the value will be reasonably equivalent, notwithstanding a discrepancy,

---

[12]Value is defined in RCW 19.40.031(a):

"Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person."

because the debt amount is the measure of the value of the interest in the assigned asset. Thus, even if the value of the loaned amounts given to Stephen was disproportionate to the value of the property assigned to Stanley and Ruth as security, the transfer cannot be invalidated on this basis alone, because the amount of value exceeding the debt secured remains available to unsecured creditors, such as Sedwick.[13] Thus, a genuine issue of material fact exists as to whether Stephen received reasonably equivalent value in exchange for the assignments.

The Gwinns also argue that summary judgment is inappropriate for another reason. They contend that a genuine issue of fact exists as to whether Stephen intended to incur, believed, or reasonably should have believed that he would incur more debts than he would be able to pay.

We agree. The affidavits and declaration submitted by the Gwinns state that Stephen did not believe that Sedwick would be awarded attorney's fees in the parenting plan modification proceedings. This fact gives rise to the inference that Stephen did not necessarily have reason to believe that he would incur more debts than he would be able to pay. Although the record indicates that Stephen procured the loans because of a cash flow crisis, the record also indicates that Stephen owned other assets. Sedwick has not shown that Stephen could not have sold these assets to pay his debts instead of obtaining loans from his parents. In addition, one inference that can be drawn from the fact that he obtained the loans to pay his litigation and personal expenses is that he *was* paying his debts as they became due.[14]

---

[13]Moreover, even if the discrepancy between the loaned amounts and the value of the security were a valid basis for entry of summary judgment, there is a genuine issue of material fact concerning the value of property assigned as security. On the one hand, Sedwick claims that the total value of Stephen's assignments is, at minimum, $184,725.61. This sum consists of $57,592.05 for the Carter real estate contract, $79,133.56 for the S&M Partnership interest, and $48,000 for the GLG Partnership property. On the other hand, the Gwinns claim that Stephen's interest in the GLG Partnership property is worth less than $48,000.

[14]Despite Sedwick's contention to the contrary, the record indicates that Stephen did *not* admit to insolvency.

Viewing the evidence in the light most favorable to the Gwinns, we find that Sedwick has failed to demonstrate by "substantial evidence" that no genuine issue of material fact existed on the issue of the constructive fraud, and thus, summary judgment was inappropriately granted on this basis. Because a genuine issue of material fact exists on both Sedwick's actual intent to defraud and constructive fraud claims, the trial court erred in granting Sedwick's motion for partial summary judgment.

Reversed.

SCHOLFIELD, J., and FORREST, J. PRO TEM., concur.

Reconsideration denied February 25, 1994.